Jenifer L. Tomchak (USB 10127)
Kinsi G. S. Bollinger (USB 17365)
TOMCHAK | SKOLOUT
10 West 100 South, Suite 700
Tel: (801) 831.4820
Jen.tomchak@tomchaklaw.com
Kinsi.bollinger@tomchaklaw.com
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| ANIL LAXMAN<br><br>    Plaintiff,<br><br>v.<br><br>The STATE OF UTAH; and the UNIVERSITY OF UTAH, a government institution of Higher Education.<br><br>    Defendant. | COMPLAINT<br><br>Case No. 2:23-cv-274<br><br>Honorable<br><br>Jury Demanded |

Anil Laxman, through his undersigned counsel, hereby complains against the State of Utah and the University of Utah ("*University*") as follows:

**JURISDICTION AND VENUE**

1. Dr. Laxman brings this action under 42 U.S.C. § 2000e et seq. ("***Title VII***") to redress unlawful discrimination and retaliation by the University against Dr. Laxman because of his race and national origin.

2. This Court has jurisdiction under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343(a).

3. Venue is proper under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b)(2).

## 4. PARTIES

5. Plaintiff is an individual of Asian race originating from India who at all relevant times was a resident of Salt Lake County, Utah and employed with the University of Utah from December 1, 2016, through July 17, 2021.

6. The University of Utah is a state institution of higher education located in Salt Lake County, Utah, and, at all times relevant to this Complaint, was Dr. Laxman's employer.

## GENERAL ALLEGATIONS

7. Plaintiff was hired as the Director of the University of Utah Metabolic Phenotyping Core Facility ("*MPC*") on or about December 1, 2016. As the MPC, Dr. Laxman provided scientific resources, state-of-the-art technologies, and novel approaches to support metabolism research conducted by University researchers. In addition, he provided his expertise in designing and conducting a wide range of studies, with the goal of accelerating the pace of scientific discovery.

8. At that time, Dr. Laxman had spent over twenty years working in well-known metabolism research laboratories on various topics of integrative metabolism, including extensive experience conducting metabolic phenotyping studies. Also, prior to joining the University, he worked as a research-track assistant professor at the Icahn School of Medicine at Mount Sinai, New York.

9. In an effort to induce Dr. Laxman to join the University, and as supported by his offer letter, the University promised Dr. Laxman the resources normally attendant to the Core Director position he was being offered and the ability to run the core independently.

10. Relying on these promises, Dr. Laxman accepted this position with a significant paycut and incurred the substantial cost to relocate to Salt Lake City, UT.

11. Dr. Laxman was only willing to accept the paycut and move his family across the country at his own expense because of the promises the University made to him about his position.

12. Upon arriving at his position, Dr. Laxman was almost immediately treated in a disparate manner from his peers and met with broken promises.

13. For instance, the **MPC** Director that Dr. Laxman replaced had been a tenure-track faculty member position and the University provided her two Ph.D.-degreed scientists to assist her. Despite this support, that *MPC* Director struggled to successfully fulfill the purposes of the *MPC*.

14. In contrast, Dr. Laxman was not given support staff, except for a part-time technician during a brief stint from February 2019 to February 2020. He often had to work extra hours, holidays, and weekends in order to improve the performance of the *MPC*.

15. His supervisor, Dr. John Phillips, treated him in a threatening manner that worsened over time and with an utter lack of respect that appeared related to Dr. Laxman's protected classes.

16. None of Dr. Laxman's Caucasian colleagues were treated with the same disdain or threatening manner as Dr. Laxman. Even with little or no support staff and the hostile work environment created by Dr. Phillips, Dr. Scott Summers, Dr. Jared Rutter, Dr. James Cox, and other Diabetes Metabolism Research Center ("*DMRC*") member faculty, Dr. Laxman was able to conduct hundreds of experiments in support of about fifty University labs. Dr. Laxman's exceptional efforts as director of the *MPC* resulted in increased efficiency,

enabling the University to increase its usage of the *MPC's* services and thereby significantly increase its revenue.

17. Despite this, the University declined each of his requests for a full-time technician.

18. Despite his successes, upon information and belief, because of his race and national origin, Dr. Laxman was treated dissimilarly than his colleagues. Indeed, despite being a Core Director, he was treated like junior staff.

19. For instance, on or around April 2019, Dr. Summers and Dr. Rutter prepared a P30 grant application ("*Grant*") for submission to the National Institute of Health ("*NIH*").

20. Drs. Summers and Rutter included a request for funds in the *Grant* to establish core facilities in the *DMRC*.

21. Dr. Laxman provided a write-up describing the metabolic testing services in the *MPC*, which was included in the *Grant*.

22. Dr. Laxman learned from the draft proposal he received from Dr. Summers that the metabolic testing services at the *MPC* would be divided between two cores— the Cardiometabolic Physiology Core run by Dr. Summers and the Molecular Metabolism Core run by Dr. Rutter.

23. Dr. Laxman discovered that he would be working as a specialist/core manager in the Cardiometabolic Physiology Core under Dr. Summers, but his Caucasian core facility directors were not assigned similar demoted roles.

24. Dr. Laxman was surprised by this informed Dr. Summers of the discrimination and the University's policies against discrimination.

25. Dr. Laxman's directorship of the *MPC* in this application was an important step in his professional growth and commensurate with his Core Director position and expertise.

26. Then, Dr. Laxman's supervisor, Dr. Phillips, unilaterally and without Dr. Laxman's knowledge or approval, appeared to demote Dr. Laxman by adding another Core Director, Dr. Summers, and another faculty member as advisors to the *MPC* and falsely stating that they supervised Dr. Laxman.

27. This was not only untrue—Dr. Laxman had supervised and directed the *MPC* alone for approximately 30 months—but it caused Dr. Laxman to lose esteem with his colleagues and others in his field.

28. The application also falsely suggested that Mr. Summers and the other faculty member had supervised Dr. Laxman during the foregoing 30 months, which falsehood served to prevent Dr. Laxman from being recognized for his successful direction of the *MPC* during that time. This was a big deal in Dr. Laxman's field and in the academic community.

29. There was no purpose for including such falsehoods other than to allow Dr. Laxman's Caucasian colleagues to be recognized for Dr. Laxman's achievements.

30. Dr. Laxman expressed his concerns about potential discrimination based on his race or nationality to his supervisor, Dr. Phillips. In response, Dr. Phillips threatened to fire Dr. Laxman if he filed any Equal Employment Opportunity (EEO) complaints or refused to comply with the arrangements proposed by Dr. Phillips.

31. After Dr. Laxman raised his concerns, Dr. Summers sent a modified draft of the *Grant* where he mentioned that Dr. Laxman holds the position of Assistant Professor at the University of Utah.

32. Dr. Summers also promised Dr. Laxman an Assistant Professorship in the Department of Nutrition and Integrative Physiology, where Dr. Summers serves as Chairman. However, Dr. Summers later refused to fulfill that promise once the *Grant* was submitted to the *NIH*.

33. In or around January 2021, the **DMRC** co-directors had a meeting to present the structure of resubmission of the **Grant** (which had been rejected). In attendance were approximately one hundred of Dr. Laxman's metabolism research colleagues. In this meeting, Dr. Summers publicly announced that Dr. Laxman serves as a Core Manager under Drs. Sihem Boudina and William Holland, a lower position than his actual position as a Core Director, giving the appearance that Dr. Laxman had been demoted.

34. Moreover, Drs. Summers, Rutter, Phillips, and Cox excluded Dr. Laxman in discussions about the **MPC** and other matters relevant to Core Directors and unilaterally made changes involving the **MPC**, including the reporting structure for Dr. Laxman. Dr. Laxman should have been included in these discussions and changes as the Director of the **MPC** and in accordance with the requirements of the **Grant**.

35. Moreover, Dr. Laxman was treated dissimilarly and in a discriminatory manner by being forced by other directors to report to them, as opposed to being in an equal position to them as he was also a Director.

36. No other Core Directors were removed from grant applications, publicly presented as having a lower position, or prevented from having opportunities for professional growth he/she had earned in order for his/her colleagues to receive that opportunity instead. In other words, Dr. Laxman was treated dissimilarly and worse than his colleagues.

37. Indeed, on multiple occasions Dr. Phillips used the threat of firing Dr. Laxman to coerce Dr. Laxman into not reporting the discrimination he experienced. For instance, he would say, "you know I can fire you" or words to that effect, on a regular basis when Dr. Laxman would ask for fairer treatment.

38. Other discriminatory or retaliatory actions taken by the University include:

a)      Dr. Phillips informed Dr. Laxman that if he ever had a disagreement with a colleague, it was Dr. Laxman's duty to simply agree.

b)      Dr. Laxman's supervisor removed five days of Dr. Laxman's vacation in violation of University of Utah policy. Specifically, Dr. Laxman was entitled to fifteen days of vacation, but his supervisor would only give Dr. Laxman ten days of vacation. Indeed, when Mr. Laxman's mother was ill, he requested time off to be with her. Dr. Phillips denied that request and told Dr. Laxman that he was not entitled to time off despite his entitlement to fifteen days' vacation per year

c)      When Dr. Laxman reported how a coworker attempted to assault Dr. Laxman to Dr. Phillips, Dr. Phillips took no action to report this occurrence or seek repercussions for the perpetrator.

d)      During an *MPC* advisory committee meeting held on June 22, 2021, Dr. Phillips commanded Dr. Laxman not to speak and told he could only listen to the committee members, preventing Dr. Laxman from responding to false allegations made against him by *MPC* advisory committee members Dr. Scott Summers, Dr. Rutter, Dr. Holland, Katsuhiko Funai and Dr. Cox. Dr. Phillips refused to give Dr. Laxman an opportunity to respond to the allegations or present evidence and instead stated that Dr. Laxman would receive a letter indicating either demotion or termination.

e)      Dr. Phillips bypassed the University's investigative procedures of the allegations against Dr. Laxman and instead issued a termination letter on July 2, 2021.

      f)      Additionally, Dr. Phillips refused to credit Dr. Laxman's position, instead minimizing his role as a "service position," despite being tasked with the duties of a University faculty member and with the hardships of working without support personnel.

      g)      After submitting the *Grant*, Dr. Phillips threatened Dr. Laxman stating he was "keeping an eye" on Dr. Laxman and that he could "terminate [Dr. Laxman] at any time" or words to that effect.

      h)      During a meeting with Dr. Phillips and Ms. Brenda Smith to discuss a complaint by *DMRC* co-directors regarding Dr. Laxman's faculty appointment request and research grant opportunities, Dr. Phillips stated that he will "cut off Dr. Laxman's balls."

39. Dr. Laxman made a complaint to **NIH** of the discrimination he was experiencing at the University which the **NIH** forwarded to his employer.

40. The University conducted anonymous satisfaction surveys among labs that received support from core facilities like *MPC*, in accordance with *NIH* funding requirements. Out of hundreds of tests he ran annually for dozens of university labs, Dr. Laxman received only two or three reports of less-than-positive feedback from labs that received support from the *MPC*. That number of complaints was well below the University's threshold for indicating problems with *MPC's* service. Additionally, since the surveys were anonymous, it was impossible to verify the authenticity of the complaints.

41. Dr. Phillips, in an effort to terminate Dr. Laxman for his reporting of their discriminatory conduct, fabricated negative complaints about Dr. Laxman. In one such instance, Dr. Laxman assisted Dr. Summer's graduate student with a metabolic test and made suggestions

about how she may be able to modify the protocol to improve her results. The student expressed her gratitude to Dr. Laxman and ran the protocol as he suggested, resulting in improved test results.

42. That student and Dr. Laxman ran three additional experiments. And the student even requested Dr. Laxman's help with similar experiments just three days before his last day at the University. This suggests that Dr. Laxman's assistance was beneficial and contradicts the fabricated complaints made by Dr. Summers in an attempt to terminate Dr. Laxman's employment.

43. But, in an effort to fabricate negative feedback about Dr. Laxman so that the University could terminate him on the pretextual grounds, such interaction was characterized negatively (not by those involved in it) as Dr. Laxman refused to permit a graduate student to run her protocol.

44. This fabrication is absurd. The student herself had never complained or otherwise expressed anything but gratitude to Dr. Laxman.

45. On or around July 17, 2021, however, Dr. Laxman was terminated, upon information and belief, for making complaints of discrimination.

46. In the termination letter, Dr. Laxman is referred to as a Research Associate as opposed to his given and accepted title of Director of the University of Utah Metabolic Phenotyping Core Facility.

47. In the termination letter, the University made false allegations against Dr. Laxman as a pretext for the discrimination.

48. Notably, the letter does not refer to any *MPC* survey complaints.

49. Indeed, in May 2021, just sixty days before Dr. Laxman's termination, the Director, Dr. Phillips, sent a letter to NIH stating that Dr. Laxman was a good scientist and should continue the great scientific research work he had been carrying out at *MPC*.

50. No investigation occurred to determine if the allegations against Dr. Laxman were true.

51. By terminating Dr. Laxman (for discriminatory and retaliatory purposes), the University has destroyed the career and reputation Dr. Laxman spent twenty-five years building. He is no longer able to work in his chosen field and has been unable to take advantage of the academic successes he achieved while at the University.

## FIRST CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF RACE AND NATIONAL ORIGIN

52. Dr. Laxman realleges and incorporate the preceding paragraphs as though fully set forth herein.

53. Dr. Laxman is of Asian race from India, a protected class under Title VII.

54. Dr. Laxman was well qualified for his position as *MPC* Director as he had spent over twenty years working in well-known metabolism research laboratories on various topics of integrative metabolism including extensive experience conducting metabolic phenotyping studies. Therefore, Dr. Laxman had the necessary education, experience, and skills to perform his job.

55. Dr. Laxman suffered adverse employment actions including a hostile work environment, termination, demotion, denied opportunities for professional growth, and other materially adverse actions that could dissuade a reasonable worker from pursuing his job.

56. The University treated the other Core Directors as well as other of Dr. Laxman's similarly situated colleagues outside Dr. Laxman 's protected class more favorably, and gave

preferential treatment to employees, such as Drs. Summers and Rutter who were not members of Dr. Laxman's protected class.

57. The University took the adverse actions because of Dr. Laxman's race and national origin.

58. Dr. Laxman has exhausted all administrative procedures and remedies as to such alleged violations of EEO laws, by filing a complaint with the EEOC. The EEOC issued its Determination and Notice of Right Sue on January 30, 2023.

59. Dr. Laxman suffered damages as a result of the University's intentional discrimination, including emotional distress, loss of income, and damage to his professional reputation.

60. Accordingly, the University is liable to Dr. Laxman for all wages, wage increases, and benefits, and other compensation to which he would have been entitled but for the discriminatory conduct, prejudgment interest on those losses, compensatory damages, and an additional amount as liquidated damages equal to the pecuniary damages, reasonable attorneys' fees and other costs, and for such other and further legal and equitable relief as the Court deems appropriate in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
RETALIATION

61. Dr. Laxman realleges and incorporates the preceding paragraphs as though fully set forth herein.

62. The University threatened Dr. Laxman that if he reported its discriminatory conduct, he would be terminated.

63. Dr. Laxman reported discrimination based on race and national origin, a protected activity under Title VII.

64. The University created a hostile work environment, demoted, terminated, prevented professional growth, and took other materially adverse actions that could dissuade a reasonable employee from engaging in that protected activity.

65. The University took the adverse actions because Dr. Laxman engaged in the protected activities.

66. Dr. Laxman has exhausted all administrative procedures and remedies as to such alleged violations of EEO laws, by filing a complaint with the EEOC on November 23, 2021. The EEOC issued its Determination and Notice of Right Sue on January 30, 2023.

67. Dr. Laxman suffered damages as a result of the University's intentional retaliation, such as loss of income and damage to his professional reputation.

68. Accordingly, the University is liable to Dr. Laxman for all wages, wage increases and benefits, and other compensation to which he would have been entitled but for the discriminatory conduct, prejudgment interest on those losses, compensatory damages, and an additional amount as liquidated damages equal to the pecuniary damages, reasonable attorneys' fees and other costs, and for such other and further legal and equitable relief as the Court deems appropriate in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Laxman prays for judgment in his favor and for the following relief:

1. An award of damages against the University in an amount to be proven at trial;
2. All wages, wage increases, and employment benefits Dr. Laxman would have been entitled to but for the discriminatory and retaliatory conduct;
3. Compensatory damages;
4. Liquidated damages;

5.  Emotional distress;

6.  An award of pre- and post-judgment interest to the maximum extent allowed by law;

7.  An award of attorneys' fees and costs under 42 U.S.C. § 2000e-5(g)(2)(B)(i); and

8.  Such other relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED this 27th day of April 2023.

*/s/ Kinsi Bollinger*

TOMCHAK | SKOLOUT

Jenifer L. Tomchak
Kinsi G. S. Bollinger
*Counsel for Plaintiff*